Welcome to the Richard Chambers Courthouse here in Pasadena. We're delighted to be here. This is the time set for the case of United States v. Steven Duarte. If counsel is ready to proceed, you may come forward and begin. Would you want to reserve time for state your appearance and then go? Good afternoon. Thank you, Your Honor. May it please the Court, Sonom Henderson for the appellant, Steven Duarte. I plan to reserve six minutes for rebuttal, and I'll do my best to watch my clock. And I'll try to help you. Thank you. So the founding generation had no tradition of disarming prior felons. Such laws are a 20th century invention, with the federal government first disarming violent felons in the 1930s and then expanding to all felons in 1968. At the same time, the felony category has swollen enormously since the founding. Modern felonies now include traditional, deadly, serious things like murder, but also much heavier things like selling pigs without a license. The government nonetheless claims that historical principles permitted to permanently disarm anyone who's committed any modern felony. But its purported principles boil down to an ahistoric claim that it can disarm whoever it wants for as long as it wants. Counsel, so the merits are interesting in this case. But before we get there, we've got a standard overview issue that three judge panels said that good cause exception applied. Yes, sir. Because I review that. We're the only circuit that has said that the only good cause applies and that it subsumes plain error. Is there a basis in your view not to apply plain error review to the constitutional claims here? Yes. So we're not the only circuit that says that. The Third Circuit says that, and the Tenth Circuit say it as well. The Tenth Circuit says good cause without applying plain error. The Tenth Circuit says good cause without applying plain error. Bowline, which we cite in our response to the PFR. It's 9-1-7-F-3-12-27. So we say the correct standard to good cause, that's what this court held already in Guerrero. That's what it did in Aguilera-Rios. And there are solid and textual and practical reasons for that. So what the Third Circuit said recently is that Rule 52B is a general catch-all rule for unpreserved errors, while Rule 12C-3 is a narrow, more specific rule that singles out certain classes of defenses that are supposed to be raised by pretrial motion. And so the use of this defense has been raised later in the trial as well. It... At trial or by post-trial motion? Had it... I guess I'm... Bruin hadn't come out until after the trial here. Is that what Your Honor is asking? I'm just saying in terms of procedural boxes. You could have filed a 12B-3 on this, but you also could have raised it at trial, and you could have raised it by post-trial motion. So you have separate defaults that are not covered by Rule 12, special good cause rule. Right. But 12B-3 would have been a perfectly reasonable way to raise it, and the government has never challenged that we could have brought this as a 12B-3 motion. My point is that you have other procedural defaults, and just as a matter of hella practice, we don't consider points not raised below, and that's a procedural default, and normally we require a plain error to get around that. I guess, Your Honor, which... So which would you need? Like when you say he could have brought it up later? Because it goes to whether or not he can be put in prison at all for this offense. Right. It's not something that can be procedurally forfeited simply because it wasn't raised in a motion challenging the indictment. At trial, or certainly in a post-trial motion, you could have raised an as-applied constitutional challenge. Under what vehicle, I guess? I mean, you certainly could file a motion for a new trial and say that... or even a motion, I presume, for a judgment of a court. It can't be that you cannot raise the constitutionality of a statute at trial. You could have asked for instructions that conform to the Constitution. There are procedural... There are different ways, but to get it kicked out, as a, you know, as a... to get it, you know, just kicked out of court, under Rule 12B-3, we would have had to bring it before trial. It didn't do that. He didn't bring it. And because it didn't exist, but we have good cause for not having done it. That's our argument. And there's some cause for that particular procedural default. But you have the default of not raising it at all in the district court. But I suppose we have the... Because we could have brought it that way and didn't bring it that way, because we had good cause not to bring it that way... ...but not raising it and not raising it before trial to get a more lenient standard on it. No, because it falls... I mean, because it falls under 12B-3, and 12B-3 operates under a good cause standard. And, again, it's a narrow rule that, in general terms, narrow rules generally trump more general rules. And that's what the Third Circuit held in SOC in the case that we had in our 28J letter recently. And I think there are good reasons to just apply good cause here, because the main point of both good cause and plain error is to force litigants to bring challenges at the proper time, to have them make their best efforts in trial court. And the good cause standard really effectively does that. It's a hard standard. The government cites United States v. FON as an analogous case that says Rule 11, Harmless Error, has equal dignity with Rule 52, and therefore both are applicable. And so other circuits have also applied both Rule 12A and Rule 52. What's your response to that? What I was winding up to say, which is, again, that it doesn't make much sense to apply both of them because they kind of both occupy the same space. They're both doing the function of getting litigants to litigate their issues at the correct time when they have them. And good cause does that really effectively. It's a harsher standard in a lot of ways than plain error, not in every case. That's not what the panel said. The panel said that plain error was a harsher standard. In this case, because of the facts of the case... Explain to me where good cause would be a harsher standard than plain error. Where the person could have brought the claim because the claim existed and just didn't bring it. So you don't have good cause, and so it's gone. The corral was actually litigated from the other side with the defendant asking for plain error and the government asking for good cause because in that instance, it was a better standard for the government. So generally, I think this court has found good cause much more rarely than it's found plain error, and that's one of the reasons I described it as more harsh. And no one is going to skip an issue that they could bring, thinking, oh, I'll just win on good cause at the appellate level. So it's already doing the work that a plain error standard would do in terms of changing or controlling litigant behavior in the trial court. And so to have both is just setting this court up for more briefing from both sides. So how does that overcome the United States v. Thon and the government's argument? Because my understanding is the base of the government's argument is that you could apply both. But that's what Thon said. The basis for Rule 11H and the parallel, they draw a line to the same. Right. And I'm saying that I think that to apply them both, it might make sense in that Rule 11 context. It doesn't make sense here because the Rule 12 rule and Rule 52 are occupying the same space. Isn't harmless error also less helpful than good plain error? I'm sorry. In other words, you're saying it's harder to meet the good cause standard than it is to meet the plain error. It's also harder to meet the harmless error than it is the plain error. No, it's not just that it's harder. To my mind, the good cause and the plain error are occupying the same field. They're serving the same function. So to apply them both is kind of unnecessary. And the fact that they're occupying the same field seems to be undermined by the examples you gave of how they can apply differently. It seems like in that sense, Rule 12 is really focused on what you do before the district court. Plain error is really what the Court of Appeals applies as a review in those circumstances. No, because what you do in front of the district court also. I mean, if you ask for it in front of the district court, you don't end up with plain error. Plain error is about whether the court catches it after you fail to ask for it. But they're both about whether you fail to ask for it. And I'm saying that the good cause already takes care of getting you to ask for it when you're supposed to ask for it. If it does apply in this case, is there an avenue for you to win? So certainly we argue in the briefs. I know that there are strong arguments for a good cause. But, I mean, first of all, plain error is plain at the moment of decision. So we'll see what happens between. That's not actually accurate under Griffin v. Kentucky. Under Griffin v. Kentucky, the Supreme Court was considering whether or not the newly determined Batson affirmative defense could be raised when it hadn't been raised below because the case hadn't been decided yet, which is akin to our case. And what the Supreme Court held there was that on direct review of a criminal case, we must consider the law as it exists at the time of review. In fact, the majority opinion was very adamant about that, saying how can we create a right and then hold that the defendant lost the right because the law happened to change after the final conviction. And so in considering Duarte's second amended challenge under either standard of review, we must consider Bruin and Rahimi and analyzing whether that is an error.  At the time of review. Yes. I was actually going to say that the Supreme Court may also do more before you got this court ruled. Oh, I think so, too. And that may make things even, make things plainer. So there's that, first of all. And there's also this court's purely legal issue test. But there's. The government's arguing that we should, if we go under plain error, we should then go on to reconsider our pure question of law and intervening change of the law jurisprudence. But we really don't need to get there if we come to the same result under either the plain error standard or the Danova review standard, correct? No, if you come to the same result, I don't. No, if we come to the same result affirming the district court, we don't need to. That is true. Get there. I'd prefer you not to. Which is the government's position. Right. So why would the government be trying to go out and reach these other issues when we don't need to reach them if we will for them? I mean, I suppose I dislike that rule. I'd like to see this as a vehicle to change it. I agree with that. So maybe we could go to the merits. Okay. I didn't hear your best argument as to why the error is plain at the moment of review. I mean, it's plain because Broome and Rahimi plainly require a historical tradition of similar regulations, and they're just as plainly as not any similar tradition of review. Rahimi says as to the how issue that it applied to greater includes the lesser rationale.  Given that the standard penalty for serious crimes at the time of the founding was death, and being dead you can't exercise many rights, why isn't Rahimi's greater include the lesser support the government's position here? So I'll answer that. Actually, I need to take us back to a couple things to get to that. I mean, the first thing is this notion of serious crimes that the government's relying on is a definitional bait and switch in the sense that the government's saying at the founding serious crimes were punishable by death. Therefore, you should punish serious crimes today, you can punish serious crimes today with anything short of death, and felonies are all serious crimes. But it's not using the founding error definition of a serious crime, it's using its own here and today definition. Because using a founding error definition of serious crime would be something more like what the panel did. You want to call this a serious crime, show us that this is actually something that the founders regarded as death worthy or analogous. In the First Amendment context, if we apply the exception force, you know, it's up to us. Judge Collins, can you speak into the microphone? I'm having a little trouble hearing you. Okay. Can you? Yeah. Maybe it's not on. Okay. In the First Amendment context, speech isn't protected if it solicits unlawful, you know, integral to unlawful conduct. Do we judge the scope of unlawful conduct based on what was unlawful in 1791, or does it expand as the criminal code expands? I mean, I think it can expand, but there needs to be some analogy. If you're relying on the seriousness of the crime, and serious crimes being something that you kill people for, therefore we can do this, there has to be something that links that serious crime to what we're calling serious crimes today. I don't. You know, there are five grades of felonies in the federal code, right, A through E. And only the lowest, E, is, you know, more than a year in prison. A looks a lot like a founding era serious felony. A is, you know, death or life imprisonment. Why wouldn't that be a serious crime? Why does the government get to define it all the way down to the lowest kind of felony today? So there's that problem. And then to go with that definitional bait and switch, there's another problem, which is that the government claims complete authority, unrestrained by history, to designate any behavior it wants as a felony. So it's saying that it can make jaywalking a felony if it so chooses. How do you get around the actual language in Heller talking about the longstanding prohibitions against felons? Sure. So that language, I don't think you can read it the way the government wants to read it. And the government wants to read it as, you know, Heller already ruled on this, 922-G1 is constitutional. Bruno Rahimi made clear that there's one test and one test only for the constitutionality of firearms regulations, and that's whether it passes through this text and history analysis and you show analogous historical regulations or regulations tied together by a principle that make them analogous. But, you know, Heller didn't purport to do that with felon and possession laws. So I think in light of Bruno Rahimi, the best reading of it is that it's saying that it's not ruling on felon and possession laws, they're not before it right then, that it would deal with them when it got to them. And for the time being, it didn't want people running out saying, oh, Heller struck down 922-G1. Well, what do you make of the fact that six justices in Broome reiterated that language, including Justice Alito, who said, our holding decides nothing about who may lawfully possess a firearm or requirements that must be met to buy a gun. And we repeated the language in Heller upon which Bonsai relied. Again, I mean, there are different ways to read that, but if you read it. Let me change it. Was there anything explicit in Bruin that said that the government could not categorically exclude a set or a category of persons from the Second Amendment right? No, there's nothing in Bruin that says you can't categorically. It doesn't address it at all, right? Sorry? It doesn't address that at all. It does say that there's one test, and one test only for firearm regulations. And so whether it's an individual firearm regulation or categorical firearm regulation, the government still has to meet this text and history test. It needs to show analogous histories. If it wants to take a category, then it needs to show that the founders would have taken weapons away from a category, either that category or a category analogous to that category. But Council of Bruin didn't purport to overrule Heller, did it? It didn't, and it doesn't need to. Heller didn't hold that 922G1 was constitutional. That's not. It did hold that felons could be precluded from having weapons. I don't think it held that. Well, it said that. Maybe it didn't hold it, but it said it. It said they were presumptively lawful and that it would do the analysis down the road when those cases came up. So it doesn't, you know, again, in light of Bruin and Rahimi, Bruin saying there's one test, Heller definitely didn't do that test. So if you're reading the two together, then it can't mean that they've already held it. But don't you think the Supreme Court would have addressed that point if it was intentioned, if it's the intention to somehow cabin the language in Heller? I think it was, I mean, the language in Heller, I guess it's not, I don't know that the Supreme Court's going to say, well, and our test that we've just said is the only way for regulation to be legal also applies to the language in Heller. To me, the language, you know, this is the only way for a gun regulation to be constitutional. That is clear enough to make clear that as we read the language in Heller, which is there and which has been repeated, we can't read it to mean just all felon in possession laws, no matter which felons, no matter which laws, are constitutional. And I guess I would say, you know, if you want to read more into it, the court only expressed presumptive approval for longstanding prohibitions on the possession of firearms by felons. So that's not specifically blessing 922 T1, which is not longstanding. It's only 10 years older than I am. And notably, the most longstanding federal firearms ban is the one from the 1930s, which barred violent felons. So it's actually, you know, you could read it that way to be consistent with exactly what we're asking for here. It didn't go out of its way to say nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 states shall issue licensing regimes which rely on these national background checks, which check to see if someone's a felon or not. So to say that a, so that says that, you know, just because we're saying may issue, you know, may issue regimes are not constitutional doesn't mean that shall issue. Sorry, it's just because we're saying may issues are unconstitutional doesn't mean shall issues are also unconstitutional. But it doesn't tell us about the content of the background checks. It doesn't say anything anyone. But it doesn't say what those background checks are because it's a national system. Right, but it doesn't say anything that anyone throws into a background check, or anything we decide to do because it's a background check is constitutional. You'd still have to look at is this actually, you know, the, is this actually something that the founders, would it fit with the tradition that the founders recognized? How would you know what's differentiated between serious and non-serious felonies? Are the serious ones the only ones that are punishable by death? Is it anything like that? I mean, I think if you're going to, if we're going to use that as a rule, then we need to do something like what the panel did and tie it to the history. And you could, I think you could tie it to the history as the panel did by saying, okay, let's look at, you know, because not all felonies at the founding were capital. And not everybody was actually killed at the founding. If you're going to say this is a felony, therefore it's like what happened at the founding, you need to show that it's actually in some meaningful way like what happened at the founding. I, you know, I guess you could also, one way of doing that would be to look at what we treat as particularly serious in the same way, like, you know, a class A felony, right? If that's, if we're going on a, you know, the government can disarm serious people because, serious criminals because serious criminals were executed at the founding. Under your logic, under your view, could Al Capone have a gun after his tax evasion conviction? There should be a quick yes or no, right? Because he's, well, I'm trying to think. So he's only convicted of tax evasion. That's, that's, that's, that's the. And the answer would be yes. That's the theory of it. I mean, the answer would be yes. That should be like a bam. Yeah. Replicate bam. Presumably, you know, they charged him for something more. So a neo-Nazi gang member who's been convicted of trafficking methamphetamine in young women. How about him? I think with that, it would depend on the volume and, like, whether those, I mean, those, if we're using what we treat as serious today, right, that could mean a whole lot of things. I mean, child pornography, people, some people think is very serious. Some people don't think it is. So, but for the neo-Nazi guy, could he have a gun? Under my violence, non-violence test or under the penal test? Whatever you're asking is, if I hand you the pen, I'm saying, hey, you can join, you can be judge number 12. You're going to write this opinion. Do I get more than one vote? Trying to get at least one. So I'm giving you the pen. So the neo-Nazi suffered. So, I mean, in terms of the penal test, it would be whether those things are, you know, the government can show some connection between those and things that the founders treated as serious. I don't know. I don't know. And people trafficking. And the answer would be that he could have a gun. Well, that's how the people are. I don't know how the founders treated kidnapping or something. But in terms of violence, non-violence, I think it would be, yeah. Is that the distinction you're asking for is violence or non-violent? Violent crimes or non-violent crimes? And then the next question is, how do you determine that? Do you look only at the crimes charged? Do you look at the entire criminal history and the PSR? Because I don't think anybody could walk away from Duarte's entire criminal history and say that he's a non-violent person. Well, that's a lot of pieces there. So in terms of what we're asking for, either what the panel did or the violence, non-violence line that we have in our briefing, either of those is much more historically tethered and much more faithful to Bruin or Rohingya than anything that the government's asking for. In terms of how we determine it, it would be, the question would be whether the person being disarmed had been convicted of, since that's the language from 922 G1, of a crime involving the kind of violence the founders recognized warranting disarmament. You could look to Rahimi, the physically attacking others or being a credible threat to attack them, or rebellion seems to come up a lot. And this fits Rahimi, which says the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others. And it fits the examples, which the people being regulated historically were either people who've done violent things, like undergoing armed laws, shorty laws, or engaged or supported violent rebellions, like the Shane's Rebellion, or to the extent you think they're part of the people, the Loyalists. And then... Well, what about disarming the Catholics, the Native Americans, the slaves? Well, so none of those people were part of the people. And that's a key distinction, because looking at how the founders treated people they did not consider to be part of the people cannot tell us how they treated people, or would treat people who were part of the people. So I think the government has conceded in Rahimi that slaves and Native Americans were not considered part of the people. They may have done the same with Catholics, I'm not sure. But the theory with Catholics... Sorry? The one from... No, the one from Bruin and Rahimi, all Americans. Yeah, I haven't... It's not voting. These individual rights are different from civic rights like voting. Yeah, what I'm using for the people is the definition that the Supreme Court offered us for Heller and Bruin, which is all Americans, all members of the national unit. And these groups were not considered... I mean, the Catholics during the French and Indian War were considered to be with the Papists, and with the French were fighting the Americans, who at that point were the British. So I don't think you can look at those and say that's how we would have treated the people. Do you want to reserve time? I'd like to reserve time. I don't want to leave questions unanswered, but I'd like to reserve time. May it please the Court, William Glasser for the United States. Duarte's unpreserved challenge to Section 922G1 should be reviewed for plain error, and under any standard of review, the statute is constitutional as applied to him. I'd like to start with plain error and briefly address Mr. Duarte's contention that there's no reason to apply both the good cause standard and plain error because they essentially answer the same question. That's actually not how it works. So under Rule 12b3, there are certain defenses that need to be raised before trial because they are essentially pretrial kinds of defenses, for example, suppression motion under the Fourth Amendment. Now, if you fail to raise one of those arguments before trial, a defendant may attempt to show there was good cause for it. For example, he didn't receive discovery in time to raise that challenge before trial. He didn't have the facts that would have allowed him to bring that challenge at that time. Rule 52, both A and B, answers a different question, which is if you fail to raise a claim at any point during trial and only raise it at some subsequent time, what standard applies to that claim? And under Rule 52b, for an unpreserved claim, the standard is plain error. There's no inconsistency with applying both of those standards so that a defendant, I think I agree with Mr. Duarte, it's going to be an unusual situation where a defendant is going to satisfy the good cause standard and then move on to plain error. But that's actually a very consistent way to read the rules. If you can show good cause for some reason you weren't able to raise the claim before trial, if you fail to raise it at any point during trial and you get to appeal, then even if you can show good cause, the court ought to review for plain error, which has different requirements than good cause. So good cause is essentially any cause that would have prevented you from raising it at the time. Rule 52b requires an error that's plain, it requires prejudice, and it requires an effect on the integrity of judicial proceedings. Those are different questions. Can you address the other court of appeals decisions, and specifically the Tenth Circuit, because I didn't have the same reading, and I want to hear your take on that. The counsel said the Tenth Circuit only applied good cause. I read it to apply both good cause and plain error. So, Your Honor, I regret to say I didn't look at the Bowling case that Mr. Duarte referred to. We do cite in our supplemental brief the Herrera case, and I agree with you. My understanding is that in Herrera the court said that even when someone can show good cause, you would conduct plain error review after that point. So I'm sorry I can't fully address the Bowling case. My understanding is that the panel decision was the only court that said only good cause, not plain error. That's correct. And the Third Circuit case that's cited in the 28J letter, as we explain in our 28J response, was really looking at a different question, and that question is when you fail to raise a Rule 12b-3 claim at trial, then do you get any review at all, or do you get plain error review? And so this court has said you get no review at all. If you fail to raise it, you can't show good cause. Other courts have said, well, we sort of set aside the good cause standard and apply plain error no matter what. But that's a different question. Do you think both apply here or just plain error? So, Your Honor, I mean, we think both can theoretically apply. I think in this case we would perhaps dispute whether or not good cause can be shown and whether it can even satisfy the good cause standard in the Rule 12c-3. He could have raised it at trial and by a post-trial motion. Exactly. Yes, Your Honor. In that sense, it would just be plain error, I mean, because he could have raised it at a later point that's not saddled with the special Rule 12 forfeiture. So, Your Honor, a constitutional claim like this is a little bit of an unusual circumstance. So this court, for example, in the Webster case, said that it is something that must be raised in the Second Amendment, specifically the Second Amendment ruling challenge. He said that it's something that must be raised pre-trial and therefore falls under Rule 12b-3. But I agree with you that you certainly can raise a constitutional challenge at a later point. And had he done so, we wouldn't be making an argument that he couldn't raise it at all. We would say it was preserved if he had raised it, for example, at trial or prior to sentencing. Counsel, as I understand it, your argument on the good cause portion is that change in law was the good cause. Sure. And you said you're not sure you agree with that. Can you briefly explain why? Sure. The reason that I'm not sure that we agree with that is that in the context of procedural default, the Supreme Court in Boosley said that you can't show good cause, just futility is not good cause. And futility meaning it was unacceptable to a particular court at a particular time.  So I understand that. Do you think what our circuit has said, that change in law is sufficient to show good cause? Well, Your Honor, I don't think the circuit has said it explicitly before the panel decision. Not that I'm aware of. The Seventh Circuit has said it, though. It said that a change in law where you were foreclosed before the change in law, that that can't constitute good cause. We're not sure if that's right under the Supreme Court's Boosley. Right. So I'll put a pin in that. Sure. Let's assume for a second, and you're not conceding it, I know, that there's no good cause because of the change in law that our circuit has. But I think it's a little bit of an idiosyncratic rule that says there's exception for plain error if there's been a change in law. Right. And so, A, why should we not apply that exception in this case? And, B, you know, I was obviously on the panel, so I'm not sure that that's saying that one displaces the other is correct. But in looking at it afresh, it's not clear to me that, like, if you have a change in law and it satisfies good cause, why under a precedent, that same change in law doesn't also satisfy our circuit's exception? And so you kind of end up in the same place. Right. So why is that not true? So, Your Honor, I think I would agree with you that if this court's change in law exception is correct, then probably you could satisfy both. It doesn't overturn the change in law exception. We do. And, Your Honor, I mean, this court hasn't applied it consistently. There was a question earlier about, you know, from one of my colleagues saying, yeah, but if they think the error is super plain but plain the opposite of the way that Mr. Huarte is saying, plain that they win, then they don't, in some ways they can just assume that, they can assume an over-review under the exception and still reach a result. And so you wouldn't get that, you wouldn't get it overturned. Sure. And, Your Honor, we don't need this case to fix all the standard of review problems that we've raised in our brief. I think the Gomez case, we petitioned. We don't. It's here. We don't need to reach those issues, really, do we, under our existing case law. We can just follow Griffin v. Kentucky, apply Bruin, determine to the extent to which it actually, well, we know it changes the mode of analysis. I agree with the majority opinion on that. But whether it changes it in such a way that favors Duarte, I think under plain error or under de novo review, you could come out, if we decide in your favor, we could, the standard doesn't really even matter. I agree with that, Your Honor. I would just say that the preferred analysis, from the government's perspective, is not just sort of applying de novo review because we think that's the wrong standard, but to essentially look at error and say, finding no error, we don't need to consider whether it was plain, so we really don't have to resolve whether or not plain error applies. And that's what, to me, if the panel is going to go in your direction, we don't really need to reach those issues now, maybe for purposes of our own administration, since those weren't the issues that were briefed all the way along, and this just came up in your supplemental briefing. Right. Well, Your Honor, we argued that plain error should apply in our briefing in front of the panel, and I think we were right about that. So we've preserved the plain error standard the whole way through. Let me ask you a question. Sure. I think I heard you just say that your preference is for us to apply the plain error standard and to find that there was error and to not reach the issue about whether or not. To find no error, Your Honor. To find no error, sorry, and to not reach the issue of plainness. So is that correct? Well, yes, I mean, because our view is that there's no error, we don't think you need to reach plainness. Tell me, if we apply the plain error standard, how is this case not like the First Circuit's case in Langston? Your Honor, I'm sorry, I'm not. So the First Circuit had a recent case, sorry, bear with me for a second, in Langston. Tell me, are you familiar with the First Circuit's case in United States v. Langston? No, I apologize, Your Honor, I'm not. So this is a case in which the First Circuit is analyzing whether or not there is a plain error review, whether or not 922G1 is constitutional. Okay, so I think I am familiar with it. I forgot the name. I apologize. So I'm asking you to tell me why you think this case shouldn't be, why we shouldn't decide this issue in this case consistent with the way the First Circuit decided Langston. So, Your Honor, I think the way that multiple circuits have decided 922G1 under plain error, I mean, at this point we're up to, I think, six or seven circuits. They've all done it in a very brief manner, and they've said that there is no possible way that any error could be plain. So they've skipped error, and they've gone straight to the plain step and said there's no possible way that it could be, that any error could be plain because, as of now, there's actually no circuit that has, no circuit precedent that's struck down 922G1, and it's just not plain based on Bruin. So I think that would be a perfectly appropriate way for this Court to resolve the case. That's consistent with how the Fifth Circuit. I don't know what you're saying there, is that because that's what I was thinking. It seems like if we're talking about ways the government wins but things we don't have to do, I understand your argument that we don't have to address whether or not any of the exceptions to plain error apply because we could, in theory, say, even assuming they know we'll review, if we did that, we would have to get into the merits, it seems like. That's correct. But on the other hand, what you're saying is we could address and say it's only plain error, and then we don't have to get into the merits. We just have to say, well, even if there was an error here, maybe the Supreme Court at some point fixes all this, it's not plain at this point. That's correct, and that's how many other circuits have done it at this point. The Fifth Circuit has done it in dozens of cases. We do have to get into the merits of one of those issues, I think, but I do disagree with the fact that we do have to decide the exceptions issue or we do have to get into the merits. I agree with that. Is there a way we don't have to decide either of those things? I'm afraid not. I can't give you that easy of an outcome. I apologize. We could also decide both, right? There wouldn't be anything wrong with saying plain error applies, but there was no error here. That's correct. And I think, you know, as sort of a matter of practicality, the fact that the Ombud Court is considering the constitutionality of Section 922G1 right now, it might make sense to look at the error part of plain error instead of punting for another day. But, again, you know, just as I explained, one way of doing it is just to say there's no plain error. You mentioned the Gomez case. Do you believe that the Gomez, assuming we thought that we needed to correct our plain error standard in this court, does the Gomez case, in your mind, present a better vehicle than this case to correct that? I think they would be essentially equally good vehicles, Your Honor. I mean, that one, that's the only question that's presented. It doesn't have the, well, it's not the only question. I'm just going to take that back. There is a separate question there. But I think that's maybe the merits question there is perhaps less far-reaching than the second part of the question. You're saying the government's view is as good of a vehicle as the Gomez case. Correct. So there's no real reason we should avoid the question. No, I don't think so. Although I would point out that in Gomez, there was a different exception that was at issue there. That was the pure question of law exception. Here, that wasn't the panel's reasoning. We just sort of raised that as one thing. We marched through why all the exceptions don't apply. It was properly before us. I agree. Yes, it is. So I think if I can turn to the merits now, the second part of the question. I did have a question. I think that kind of links the two.  So the stand for plain error is, you know, one of the things is it's clearly wrong. In our case law, we only can overturn our own case law if it's clearly irreconcilable. Right. Is there a difference between clearly irreconcilable and clearly wrong for plain error? I think there is, Your Honor. I would note that I don't think that the en banc court is bound by the clearly irreconcilable standard there. So I think that's kind of off the table. But the difference between—I haven't given this a lot of thought. I think the difference is that depending on the articulation, some ways that this court has articulated the clearly irreconcilable standard focuses on the mode of analysis rather than the sort of bottom line result. And I think the clear or obvious prong of plain error is really about the bottom line result, if that makes sense. So— I have one question. These cells are kind of liquid. So, you know, I asked you earlier, we have to decide one or the other of those two issues, and we couldn't get away with not deciding either. Would it be inappropriate for us to decide both in the sense of saying if we were to say, okay, we're overruling our exceptions, only plain error. Plain error is plain error. There's no exceptions. It's sort of joining the other circuits. And so now we're going to jump. When you're doing plain error analysis, are you limited to only being able to look at the plain part, or can you—you can still look at the error part, right? That's right. That's right, Your Honor. Courts go different ways. In some cases, some courts will just look at error and say there's no error. Or you can do one or the other. Exactly. It's exactly the same. So often courts go straight to the plainness because it's easier than the merits in most cases. But the court can certainly look at the error question. But on the merits, what you're arguing, though, is that they lose on step one. And they lose on step one because they're not people within the meaning of the Second Amendment. Is that fairly stated? Your Honor, yes, that is our argument. We're preserving that argument. Although we recognize that hasn't fared well in most circuits. On plain error, has any other circuit reached that? You might be wrong on plain error. Your Honor, no other circuit has agreed with us on that point. And so I think the easiest way for this court to resolve the constitutional question is, I mean, again, not giving up our arguments about the people, but it's probably to rely on the historical analysis that we've set forth. And so turning to that, we think that there are two principles. And Rahimi requires that we look at what principles can be derived from history. I'm sorry. I just have to pause before you go on to the principles because it seems there was a statement made by your friend across the aisle that you relied on these categories of slaves and Native Americans as not being people. Did you do that? Because it seems like you relied on those categories as historical analogs in our case. Yes, Your Honor, we did. So the government's arguments have, I think, evolved a little bit as time has gone on after Bruin. So in our initial briefing in front of the panel, we pointed to some of those categories, the religious and racial minorities as some examples of people who were historically disarmed, to support the principle that at the time of the founding, categories of people that were perceived to be dangerous could be disarmed. We have not consistently relied on those abhorrent laws, certainly not in front of the Supreme Court. We think they might still support the principle, but we're not necessarily hanging our hat simply on those laws. In the briefing in front of the Supreme Court in Raheny, the government took the position that those laws can sort of be explained a different way because those were not considered part of the people at the time. So I think our reasoning has changed a little bit, but we still think that all of the history supports two principles. The first principle is that those who have been convicted of serious crimes, which we define as felonies under a 200-year-old definition approximately, that is, possible by year and a day, that those convicted of serious crimes can be disarmed. The second principle is that legislatures may make categorical judgments that certain people are too dangerous, certain categories of persons are too dangerous to be armed. We believe that history supports both of those principles, and that both of those principles, taken together, perhaps separately, but certainly taken together, support the constitutionality of Section 920-321. Can you tell us that we're supposed to be more critical and more circumspect in terms of what group of people we're talking about, what group of crimes we're talking about? Isn't that what we're supposed to be doing, and not having these broad, general statements about what crimes are considered to be within that scope? So, Your Honor, I do think that Raheny says that the principles need to be carefully drawn, right, not drawn at too high a level. That point was explicitly made by Justice Barrett in her concurrence. And we think that these principles are, as circumscribed, are narrowly drawn. But I think what's serious, what was a serious crime or serious felonies, I think, what is that? So, Your Honor, we've defined it under the traditional definition of felony, which dates back approximately two centuries, which is punishable by more than one year in prison. Now, we recognize that that's not the common law definition of felony. The common law definition of felony was one that subjected you to the death penalty or estate forfeiture. But we still think that it's a longstanding definition. And there was a sort of interesting transition around the time of the founding in how crimes were punished, going from primarily the death penalty and estate forfeiture to the institution of prisons. In 1791, there were, I think, only three states that had prisons. But very soon after the founding, the fifth states moved toward punishment in prison. And when that became the general mode of punishment, the definition of felony underwent a change and was then understood to be punishable by more than a year in prison. So we think that longstanding definition of felony is the appropriate way to draw the line for serious crimes. Opposing counsel argues that stealing a pig does not make you someone who should be sentenced to a year or two in your constitutional practice. What's your response to that? I guess my first response would be that I think the Massachusetts law that is cited for selling pigs without a license, that's for a second offense, and it's dealing in livestock. So I think this may be an exaggeration to say that twice you can have your bed taken away from you. One, a pig selling offense is not an offense. That is correct. So I think sometimes the examples of sort of silly felonies that we might say, if you actually scrutinize the laws, they don't apply in the ways that you might think. But I think sort of more to the point, it's not for this court to determine what kind of felonies it thinks ought to be punished by. So in some ways your first principle, where you're going with this is your first principle is not disconnected from your second, because at the end of the day, because legislatures decide what felonies are, both principles have a very healthy dose of deferred to the legislature built into them. So going to the second one, why couldn't a legislature say, you know, young men, age 20, 25, those are dangerous people for anybody that's had kids that are 18 to 25.  They do dumb things, which is why for a while they, you know, it costs more to get car insurance for that category. So why couldn't they just, why couldn't they say those are dangerous, and we're going to say you can't be armed from age 18 to 25 males? Sure. Your Honor, so we don't think that this court should give complete deference to legislatures. We do think that it's appropriate for courts to consider whether or not the category that the legislature has identified actually lines up with dangerousness, and we think that that's a, it is still also a historical inquiry. How rigorous do you want us to, because then that starts to feel like, we're back to tiers of scrutiny and stuff like this, because you're saying, don't rational basis this. Correct. That's what I'm hearing. So can I go strict scrutiny here or am I not allowed? No, Your Honor, we certainly can't go back to the tiers of scrutiny. I think that's inconsistent with the approach. Your Honor, no, we do think it's a historically based inquiry, and we do think that there should be some judicial scrutiny of legislative categorizations. With respect to serious crimes, though, I don't think that there really is a place for a court to say, you know what, we think it's silly that a state has made this a felony. In the Eighth Amendment context, the Supreme Court has been very clear. The courts don't. In your first argument, Judge Van Dyke was trying to tease out how far the second one goes. Sure. Okay, and I'm happy to engage with both. So with respect to the second argument, the legislative categorizations of dangerousness, we think that courts can look to a variety of things to determine whether or not it's an appropriate legislative categorization. So I think looking at how legislatures across time have treated the issue is an inappropriate way, and so we think that. That kind of begs the question I just asked, which is you say we can look at it, but if you're asking, like, that doesn't tell me how aggressively should I look at it. Do I decide whether the legislature made a good decision? That doesn't tell me more than just look at it. And then that starts to feel like tiers of scrutiny. Sure, Your Honor, so I think that the question is whether or not the legislature has acted within its discretion to identify a specific category as being dangerous. And, again, you can consider, for example, whether it, you know, disarms large portions of the population. You can consider it the way you framed it there. If it was First Amendment, say, is the legislature acting within its discretion to ban this kind of speech? And typically, you know, we would be very aggressive in reviewing that.  But, you know, has the legislature acted within its discretion to require licensing for something? So I'm just trying to figure out, like, again, those are words, but they're not helping me. So, Your Honor, I agree that there will be difficult cases. I don't think Section 922G1 is a difficult case, and the reason is that the Supreme Court has recognized and legislatures for the last century have recognized that felons as a category represent a heightened danger to society if armed. And combining that with my first principle, which I understand I was retreating to a certain degree, but Randy says we can take principles, we can take history together, read it together, to support the law. I think combining those two principles, Section 922G1... I still don't understand your answer to Van Dyck's question. I mean, suppose the statistics, and they probably do show that a majority of violent felonies are probably committed by males under the age of 30. Can the legislature ban gun ownership by males under the age of 30? And what would be the analysis we'd go through if confronted with that, set aside from the gender equal protection issue? Sure, Your Honor. So I think setting those things aside, I think the analysis would be, to kind of do this first of all, statistically, does this line up? Secondly, it would be, is this disarming sort of a very large portion of the population? And third, although maybe it should be a higher priority, it would be, is this consistent with how legislatures have treated the right over time? And so it would be hard-pressed to identify founding-era laws that disarmed people up to that age. I do think there are some... You think as well, I recall that one of the amicus briefs, I can't remember who, said that these rules fall disproportionately on black males. Do you think that's something relevant we should take into consideration and evaluate? Your Honor, I don't think it's relevant for this case because Mr. Duarte hasn't raised an equal protection claim, and he certainly hasn't shown that his preferred rule, which is violent... Your Honor, has he raised a facial challenge? That's correct. That's correct. So he's only raised an as-applied challenge. Your motive analysis was sort of how we are sort of doing the history and tradition test. Well, Your Honor, I understood Judge Collins' question. He's setting aside equal protection issues, but I think probably a more important point is that Mr. Duarte hasn't shown that his preferred rule, that is violent versus nonviolent felonies, would lessen any potential racial or gender disparities. Again, as applied to Mr. Duarte, he simply cannot show that he is someone who is not dangerous, and we think that also the fact that he's been convicted not just of one but of five felonies, we think one felony is enough, but we think five felonies makes this a pretty easy case. Counsel, what do we make of the fact that under the 14th Amendment case law from the Supreme Court, we can deny felons the right to vote and serve on juries? What is the relevance of that to this inquiry? So, Your Honor, we think that that supports particularly our first principle, the serious crimes principle, that there are a variety of collateral consequences that come along with a criminal conviction for an offense punishable by more than a year in prison. Some of those are the loss of civic rights, and we think that the Second Amendment, although it's an individual and fundamental right, we think that a similar analysis can apply because at the time of the founding, someone who was convicted of a serious crime could be deprived of a variety of rights up to and including their life. And so the fact that the 14th Amendment has the explicit language about losing the right to vote if you've been convicted of a serious crime, I'd prefer that. Right. Sure. Does that mean our inquiry should be in this case 1868? Because that's actually something in the Constitution about serious crimes and losing rights, which I don't think there is that language in the original Constitution before it was amended in 1868. So, Your Honor, the government doesn't have a firm position on the 1791 versus 1868 question. The Supreme Court hasn't decided that. They haven't decided a lot of things in this area. Right. That's fair enough. I think if I were just to think about it from first principles, I would say that 1791 is the place to start because we're the federal government here and the 14th Amendment doesn't apply to us. But I think that you can look at post-ratification history and particularly where it's consistent, where it's sort of an unbroken chain of history up to, in our view, the present day, but that indicates that the government's understanding that you can deprive someone of rights based on conviction for serious crime is completely consistent with history, whatever year we pick. I'm a little confused about how we're supposed to analyze the felony. It's indicated that we look under the name that has been put onto the crime and consider history and tradition issues. I mean, we have seen various legislatures say that all places in the city are sensitive places, or 50% or 60%. What if Congress or a legislature says all of these paper crimes, we're not going to call that word misdemeanors, we're not going to call them felonies, so that we can deprive a certain group of people of their constitutional rights. How do we look behind the words felony in that situation? Your Honor, we think that as a constitutional matter and as a statutory matter in Section 921, the definitional section, we think that the label does not matter and that the substance is what's important, and that's punishing. That's correct. That's correct. So, Your Honor, I think there are a variety of reasons why legislatures would not and haven't punished all kinds of minor crimes by more than a year in prison. And the reason is that, first of all, that would allow sentencing judges to apply those sentences, to sentence someone for a very minor crime like jaywalking to more than a year and a day. It would have the effect of allowing anyone who was prosecuted for any of those crimes to have a right to a jury trial. But what if they did? Well, Your Honor, again, they haven't done it since 1961 when the definition was expanded, the prohibition on receipt of a firearm was expanded to all felons. If they did, I think that would be a situation where we would still say that the legislature has determined that it's a serious crime. Now, I understand that there's some discomfort with that, but I think as a practical matter, legislatures have had an incentive to do that for a very long time, and they simply haven't chosen to disarm the white swaths of the population by making every minor offense punishable by more than a year and a day. If the Court has no further questions, we would ask the Court to apply plain error and at least find no error, much less a plain one, and affirm. Thank you, Your Honor. I just want to hit a few things here. In terms of the government saying that it's a danger category, it's bound by history, one big problem with that is that it does not have any historical example that comes close to disarming people permanently the way 922G1 does. Raimi and Bruin tell us you need burdens and justifications that line up. If the burden just doesn't line up, it seems to be whatever time they want to say it is, they're not looking and seeing, oh, well, the loyalists were disarmed for the duration of the war, so there's some analogy to the duration of the war. They're just saying we can do it forever without filling in that second half Bruin-Raimi analysis. In terms of the government's claim, I'm very confused by the government's claim about using a consistent 200-year-old definition of felony for a year and a day. If that's what a felony is, then why are we talking about serious crimes that are punishable by death? I mean, I think it kind of makes my point that if serious crimes are punishable by death and felonies for 200 years have been punishable by a year or more, then felonies are not serious crimes. And so it doesn't make sense to apply the serious crime logic to them. In terms of Rule 52 and Rule 12b-3, sorry, let me find you the quote I'm looking for. One thing to note is that Guerrero pointed out, in terms of Rule 52 compelling us to use plain error, Guerrero pointed to a committee report that said basically the committee got into an argument about whether and how Rule 52 should apply in the Rule 12 context. They couldn't resolve it, and so they wrote the rule in such a way as to permit the Court of Appeals to decide if and how to apply Rules 12 and 52. Can I ask you a real quick question about this? Yeah. You know, I know what the panel did. Yeah. But can you respond to my question I asked about why does Rule 52 have to, for you to get a general review, why does Rule 52 have to displace Rule 12? Or maybe I'm getting it backwards. Because even if plain error applies, why don't you get the exception for changing the law that our circuit recognizes? He, I think he would. But we, I mean, I've started from good cause. After it's said what it said, you would get it anyway, it seems like. Under this Court's current, I mean, I understand the government to be asking you to change that. I'm just trying to make sure I was understanding that correctly. You think that even if plain error applies, you get in and you escape the meeting because of the change in law? Yes. I'm almost out of time here. Sorry, Judge Nelson, in terms of the Tenth Circuit vote line, the quote from vote line is, when an untimely argument subject to Rule 12 is raised for the first time on appeal, Rule 12, good cause standard, and not Rule 52, applies. That's why I've been saying it. The Tenth Circuit and the Third Circuit are with us. And with that, I'm out of time. Thank you. Thank you very much, Mr. Blaser. Mr. Henningerson, we appreciate the oral argument presentations here today. The case of the United States of America v. Stephen Duarte is now submitted, and we are adjourned. Thank you. Thank you.
judges: MURGUIA, WARDLAW, RAWLINSON, IKUTA, OWENS, NELSON, COLLINS, VANDYKE, THOMAS, MENDOZA, DESAI